## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Thogus Products Company,** | **Case No. 1:20cv1887** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Bleep, LLC,** | **MEMORANDUM OPINION AND ORDER** |
| **Defendant** | |

Currently pending is Defendant Bleep, LLC's Motion for Preliminary and Permanent Injunctive Relief.  (Doc. No. 15.)  Plaintiff Thogus Products Company filed a Brief in Opposition on January 12, 2021, to which Defendant replied on January 19, 2021.  (Doc. Nos. 18, 19.)  A hearing on Defendant's Motion was conducted before the undersigned on March 12, 2021.  (Doc. No. 39.)

For the following reasons, Defendant's Motion for Preliminary and Permanent Injunctive Relief (Doc. No. 15) is granted to the extent it seeks preliminary injunctive relief and denied to the extent it seeks permanent injunctive relief.  As set forth herein, Plaintiff is ordered to immediately release the Bailed Property and take whatever steps are necessary to assist Defendant with the removal of the Bailed Property from Plaintiff's premises.

## I.      Summary of Facts

Defendant Bleep, LLC (hereinafter "Bleep") began operations in 2017.  It is a developer and seller of certain medical devices for the treatment of sleep apnea, including the DreamWay and DreamPort products.  (Verified Counterclaim (Doc. No. 12) at ¶ 8.)  Both of these products are designed to work with continuous positive airway pressure ("CPAP") machines. (*Id*.)  The DreamWay is an assembly that directs airflow from a CPAP machine through a hose to the

DreamPort.  (*Id*. at ¶ 9.)  The DreamPort is a set of interface tubes that connect the DreamWay to the patient's nose using foam adhesive strips without the need for straps or headgear wrapping around the patient's head.  (*Id*. at ¶ 10.)  According to Bleep's President and General Counsel, Henry Kopf, both the DreamWay and DreamPort are Class II medical devices and, therefore, subject to FDA approval and regulation.  *See* Kopf Hearing Testimony. [1]

Plaintiff Thogus Products Company ("Thogus") designs custom plastic injection molding solutions and manufactures goods for its customers.  (Doc. No. 8-2 at ¶ 13.)  Between late 2017 and early 2018, Thogus and Bleep entered into negotiations for an agreement whereby Thogus would manufacture Bleep's DreamWay and DreamPort products.  (Doc. No. 12 at ¶¶ 12-22.)  Bleep claims that, during these negotiations, Thogus represented that it either was already in compliance with, or would achieve compliance with, manufacturing and regulatory compliance standards for a "finished medical device" manufacturer under the FDA.  (*Id*. at ¶¶ 16-22.)  In addition, Bleep alleges that Thogus represented that it would be able to satisfy Bleep's specifications and quality standards for the DreamWay and DreamPort products.  (*Id*.)  Both parties were represented by counsel during these negotiations.  *See* Kopf Hearing Testimony.

On March 2, 2018, Thogus and Bleep entered into a Manufacturing Supply Agreement ("MSA") for the manufacture of the DreamWay and DreamPort products.  (Doc. No. 8-2 at PageID#s 179-210.)  Of particular relevance herein, Section 14.1 of the MSA contains the following Bailment provision:

---

[1] The Court does not include pinpoint cites to specific pages in the March 12, 2021 Preliminary Injunction Hearing transcript as the final transcript of that hearing was not available as of the date of the instant Memorandum Opinion & Order.  The Court did, however, have an advance copy of the hearing transcript which it relied on in preparing the instant Opinion.

2

(a) All Equipment and other tangible property of every description, including supplies, materials, machinery, equipment, drawings, photographic negatives and positives, artwork, copy layout, electronic data and other items, furnished by [Bleep] (or [Bleep's] customers), either directly or indirectly, to [Thogus] or to any supplier to [Thogus] in connection with or related to this Agreement, or for which [Thogus] has been reimbursed by [Bleep] (collectively, "Bailed Property") is and will at all times remain the property of [Bleep]) and be held by [Thogus] on a bailment-at-will basis. All replacement parts, additions, improvements, and accessories for such Bailed Property will automatically become [Bleep's] property upon their incorporation into or attachment to the Bailed Property.  All replacements of Bailed Property will also be [Bleep's] property.  For clarity, Bailed Property includes, but is not limited to, the Equipment and machinery listed in Schedule 2, attached and hereby incorporated by reference.

(b) Only [Bleep] has any right, title or interest in and to Bailed Property, except for [Thogus's] limited right, subject to [Bleep's] sole discretion, to use the Bailed Property in the performance of [Thogus's] obligations under this Agreement. [Thogus] shall not use the Bailed Property for any other purpose.  [Thogus] shall not commingle Bailed Property with the property of [Thogus] or with that of a Person other than [Bleep] or [Thogus] and shall not move any Bailed Property from [Thogus's] premises without the prior written approval by [Bleep].  [Bleep] may, at any time, and for any reason, retake possession, at its sole cost and expense, of any Bailed Property without notice to [Thogus], or a hearing or a court order, which rights, if any, are waived by [Thogus].  **Upon [Bleep's] request, Bailed Property will be immediately released to [Bleep] or delivered to [Bleep] by [Thogus], so long as [Thogus] has been paid in full for all outstanding, undisputed in good faith, payment obligations of [Bleep] under this Agreement.**  [Thogus's] continued holding of Bailed Property after demand has been made by [Bleep] for delivery will substantially impair the value thereof, and, accordingly, [Bleep] will be entitled to a court order of possession without any need for proving damages or a bond.  To the fullest extent permitted by law, [Thogus] shall not allow any Encumbrance to be imposed on or attach to the Bailed Property through [Thogus] or as a result of [Thogus's] action or inaction, and [Thogus] hereby waives any Encumbrance that it may have or acquire in the Bailed Property.

(*Id*. at PageID# 195-196.)

During the evidentiary hearing on this matter, Bleep President Henry Kopf testified that the "Bailed Property" that is the subject of the above provision consists of (1) seventeen (17) molds that Thogus purchased for use in manufacturing the DreamWay and DreamPort products; and (2) a machine that is used for the assembly of the DreamWay and DreamPort products.  *See* Kopf Hearing

3

Testimony.  *See also* Doc. No. 12-5.  With regard to the molds, Bleep asserts (and Thogus does not contest) that, as of the date of the hearing, Bleep has fully reimbursed Thogus for all amounts owed relating to the purchase of the molds.  *Id*.  With regard to the machine, Bleep asserts (and, again, Thogus does not contest) that Bleep provided this machine to Thogus for use in manufacturing its products and that Thogus did not spend any of its own money to purchase or modify it.  *Id.*

On November 8, 2018, Bleep issued Purchase Order Number 0025 to Thogus for the manufacture and delivery of 3,700 DreamPort Shippers and 1,110 DreamWay Shippers, for the total purchase price of $936,740.10.  (Plaintiff's Hearing Exh. 4.)  The following month, the parties executed the First Amendment to the MSA, in which Thogus agreed to extend the initial term of the MSA "such that [Bleep] can obtain its financing from the Bank."  (Doc. No. 8-2 at PageID# 209.)

Thogus thereafter began production in February 2019. (Doc. No. 8-2 at ¶ 26.) In manufacturing the DreamWay and DreamPort products, Bleep directed that Thogus use a short hose (or tube) produced by Smooth Bor Plastics.  (*Id*. at ¶ 27.)  Bleep further instructed Thogus to manually stretch the hose to fit the DreamWay product. (*Id*.) According to Thogus, however, Bleep failed to provide any specifications, drawing updates, or testing reports relating to this "product modification." (*Id*. at ¶¶ 28-29.)  Thogus was concerned about Bleep's instructions and, in March 2019, the parties entered into a Second Amendment to the MSA in which they agreed that Thogus would have no liability to Bleep or any third-party "related to or arising out of any stretched Short Hose Goods." (Doc. No. 8-2 at PageID# 210.)

While production was underway as to Purchase Order 0025, Bleep issued another large Purchase Order to Thogus on March 11, 2019.  (Plaintiff's Hearing Exh. 6.)  This Purchase Order (known as "Purchase Order Number 0028") was for the manufacture and delivery of 8,000 DreamPort

4

Shippers and 4,000 DreamWay Shippers, for the total purchase price of $1,945.520.00.  (*Id.*) This Purchase Order sets forth a series of delivery dates in June, July, and August 2019.  (*Id.*)

Production on the DreamWay and DreamPort continued throughout 2019.  Thogus President Larry Sansom testified at the evidentiary hearing that, during this time period, Thogus encountered problems with the "loose fit" of the manually stretched Smooth Bor hose.  *See* Sansom Hearing Testimony.  According to Thogus, Bleep failed to address this problem and continued to require Thogus to use the Smooth Bor hose.  *Id.*  Meanwhile, Bleep had its own concerns regarding Thogus's manufacturing process.  Specifically, Mr. Kopf testified that, despite Thogus's promises that it would fully comply with FDA standards for manufacturers of "finished medical devices," Thogus failed to ensure that its quality control systems were FDA compliant and, in particular, failed to validate its software as required under FDA regulations.  *See* Kopf Hearing Testimony.  Despite these concerns, Bleep made six timely payments towards Purchase Order 0025 in the summer of 2019.  (Plaintiff's Hearing Exh. 5.)

In August and early September 2019, Thogus issued its first invoices to Bleep under Purchase Order 0028, in the total amount of $428, 276.22.  (Plaintiff's Hearing Exh. 7.)  These invoices represented a combined delivery of 1,608 DreamPort products and 888 DreamWay products.  *Id.  See also* Doc. No. 12 at ¶ 82.  Around this time period, Bleep approached Thogus and requested extended payment terms.  *See* Sansom Hearing Testimony.  Mr. Sansom testified that he believed Bleep made this request because it needed additional time to raise capital.  *Id.*  Thogus granted the request.  *Id.*

According to Mr. Kopf, throughout late 2019 and early 2020, Bleep continued to raise concerns regarding Thogus's alleged failure to ensure that its manufacturing and quality control systems complied with all applicable FDA regulations.  *See* Kopf Hearing Testimony.  Bleep asserts

5

that, in response, Thogus suddenly reversed course and advised that it would not, in fact, validate its software or obtain ISO 13485 certification, both of which Bleep contends are necessary steps to achieve compliance with FDA standards.  (Doc. No. 12 at ¶ 84.)  Nonetheless, Mr. Kopf testified that Bleep continued to try to work with Thogus to resolve Bleep's concerns.  *See* Kopf Hearing Testimony; Doc. No. 12 at ¶ 85.  In addition, Bleep paid the remaining amounts due to Thogus under Purchase Order 0025 and, further, paid for all amounts due to Thogus for "tooling," which includes the molds that are the subject of the Bailment provision in the parties' MSA.  *See* Plaintiff's Hearing Exh. 5; Defendant's Hearing Exhs. B, C, D, E, F.

Relations between Thogus and Bleep, however, continued to deteriorate.  Bleep alleges that, in spring 2020, it began receiving customer complaints about products packaged with components missing and "clearly defective components," including "visibly cracked short hose tubing."  (Doc. No. 12 at ¶ 97.)  During the evidentiary hearing, Mr. Sansom acknowledged that Thogus received two formal complaints from Bleep in February 2020 regarding missing components.  *See* Sansom Hearing Testimony.  In response, Bleep asked to conduct a full quality audit of Thogus's operations. (Doc. No. 12 at ¶ 92.)  Bleep asserts that Thogus refused and, instead, only permitted Bleep to conduct a limited "remote desk audit."  (*Id*. at ¶ 92.)

In light of its concerns, Bleep advised Thogus on May 12, 2020 that "funds shall be placed in attorney's escrow account and released upon confirmation by Bleep's outside consultant that Thogus has systems and processes in place consistent with FDA medical device regulations and requirements," including regulations relating to IQMS validation, manufacturing process validation, manufacturing records, and material traceability.  (Defendant's Hearing Exh. F.)  Bleep's consultant, Susan Karp, thereafter conducted a "desk audit" of Thogus's manufacturing system, which

6

"identified several deficiencies and areas of non-compliance, including specific findings, based on information provided by Thogus, that Thogus's manufacturing quality system software had never been validated for its intended use, as required."  (Doc. No. 12 at ¶ 93.)

On June 9, 2020, Bleep advised Thogus that Ms. Karp had found as follows: "[W]hile Thogus is certainly taking steps in the right direction and appear[s] to be acknowledging what needs to be done, having created a pathway forward, the documents that were shared thus far are [at the] preliminary stage.  They have too many blanks left incomplete and the specifications are absent, and there is a need to verify that everything be challenged and answered as if it was a real inspection." (Defendant's Hearing Exh. H.)  Bleep stated that it was "willing to work through a way that lump sums of money are paid out of Escrow . . . with milestones to accomplish everything" but stated that "no one on our side feels like Thogus has delivered on completion of the items needed yet for validation."  (*Id*.)  In response, Thogus indicated that "we generally agree with the structure of funds being paid out of escrow based upon the completion of defined milestones" and assured Bleep that it "will be working with better specificity with respect to the milestones and deliverables."  (*Id*.)

Ten days later, on June 19, 2020, Bleep made a payment towards Purchase Order Number 0028 in the amount of $105,886.  (Plaintiff's Hearing Exh. 7.)  Bleep made another payment several weeks later in the amount of $100, 189.44.  (*Id*.)  In all, the parties agree that Bleep paid Thogus the total amount of $428.276.22 towards Purchase Order 0028, which covers all the products that were actually shipped and delivered under that Purchase Order.  (*Id*.)

Meanwhile, however, Bleep began "a manual, visual inspection of its inventory of products from Thogus and discovered additional instances of Bleep's devices being manufactured and packaged by Thogus with visibly cracked and broken tubes, missing components, bags with no

product at all in them, and multiple other quality issues." (Doc. No. 12 at ¶ 100.)  For example, Bleep states that it discovered that "multiple packaged products were missing component parts, such as the quick release (QR) socket that connects certain tubing, a missing component issue that Bleep had notified Thogus about in January 2020, and Bleep found that cases of products shipped by Thogus contained insufficient or incorrect components." (*Id.* at ¶ 101.)  Bleep alleges that it reported these product defects to Thogus but received no response.  (*Id*. at ¶ 102.)  In addition, on July 3, 2020, Bleep issued an Engineering Change Notice in which it changed the vendor for the hose used in the DreamWay product from Smooth Bor to Hi-Tech medical.  (Doc. No. 8-2 at PageID#s 222-223.)

Although Bleep had paid for the products that were actually delivered under Purchase Order 0028, Thogus introduced evidence that it manufactured an additional quantity of finished DreamWay and DreamPort products pursuant to this Purchase Order that had not been scheduled for delivery or paid for by Bleep.  *See* Sansom Hearing Testimony.  These finished products, along with raw materials and "works in progress," were stored (and continue to be stored) in Thogus's warehouse, occupying approximately 10% of Thogus's 65,000 square foot warehouse space.  *Id*.  *See also* Declaration of Matt Hlavin (Doc. No. 18-1) at ¶¶ 9-12.)  On July 16, 2020, Thogus issued a letter to Bleep in which it demanded payment for this material, as follows:

> This written demand for payment (the "Demand Letter") involves the outstanding, unpaid balance of $1,279,764.50 under the MSA (the "Outstanding Balance")).  The Outstanding Balance is itemized as follows: (i) $975,016.50 in manufactured inventory ordered by Bleep for which Bleep has failed to schedule delivery, inclusive of $50,749.46 in packaging and material costs specifically ordered and, by a vendor of Thogus, for the benefit of Bleep and (ii) $304,748.00 in damages relating to Bleep's failure to purchase the required minimum amount under Paragraph 2.2 of the MSA.

(Doc. No. 8-2 at PageID# 212.)

8

In response, Bleep insisted that it had fully complied with the MSA by paying for all finished goods under Purchase Order 0028.  (Defendant's Hearing Exh. L.)  Bleep further stated as follows:

> Bleep has requested lot information and material traceability from Thogus due to multiple recent product defects.  These defects are serious enough that a product recall may be warranted.  Your client has been unwilling or unable to provide the requested information, which is an extreme concern due to FDA requirements.  Thogus' failure to provide the requested material traceability information is even more concerning due to the regulatory compliance issues at Thogus.   Bleep's preference is to work in collaboration with Thogus to investigate the reported defects, especially as the potential root cause is material supplied to Thogus or work done by Thogus on such material.  Please confirm your client will comply with the MSA and FDA requirements regarding the product defects and material traceability.

> Receiving your demand letter, without warning, as a response to requesting information related to product defects is concerning.  This is especially true based on the prolonged history relating to Thogus's regulatory compliance issues.  There are, and have been, multiple breaches of the MSA by Thogus, including, but not limited to, failing to meet the required manufacturing standards.

(*Id*.)

Four days later, on July 20, 2020, Thogus filed the instant lawsuit against Bleep in the Cuyahoga County Court of Common Pleas.  (Doc. No. 1-1.)  On August 25, 2020, Bleep issued a Notice of Recall to Thogus, in which it asserted that the products manufactured by Thogus were defective under the terms of the MSA.  (Doc. No. 12-4.)  Specifically, Bleep asserted that: "(1) The QR socket is missing from multiple of part number 100383; (2) Multiple cases of part number 100382 have been discovered to contain 41 to 45 boxes of part number 100379 instead of the required 54 boxes of 100379; and (3) All certificates of conformance provided by Thogus are defective, as none of them identify the lot numbers of the Goods associated with the given certificate."  (*Id.*)  Thogus responded on August 30, 2020.

Several months later, on December 16, 2020, Bleep wrote a letter to Thogus demanding the release and return of Bleep's Bailed Property.  (Doc. No. 12-5; Defendant's Hearing Exh. M.)  Thogus

responded that it would only release the Bailed Property "upon Bleep's full payment of the outstanding amounts due and owing to Thogus under the MSA, as itemized and described in the First Amended Complaint."  (Doc. No. 12-6; Defendant's Hearing Exh. N.)

During the evidentiary hearing, Mr. Kopf testified that, if the Bailed Property is not returned, Bleep will go out of business.  *See* Kopf Hearing Testimony.  He explained that, without access to the assembly machine that forms part of the Bailed Property, Bleep is unable to manufacture either the DreamWay or DreamPort products.[2]  *Id.*  Once Bleep depletes its existing stock, Bleep will be unable to manufacture any more DreamWay and/or DreamPort products.  *Id.*  Bleep's customers will then be forced to switch to a different sleep apnea product, a process which Mr. Kopf described as expensive and difficult. *Id.* If this occurs, Mr. Kopf testified that Bleep's customer goodwill and reputation in the industry will be "completely destroyed."  *Id.*

## II.    Procedural History

In its original Complaint, Thogus asserted claims against Bleep for (1) breach of contract, and (2) enforcement of Molder's and Moldbuilder's Lien Rights pursuant to Ohio Rev. Code §§ 1333.29 through 1333.34.  (Doc. No. 1-1.)  Bleep removed the action to this Court on August 25, 2020 on the basis of diversity jurisdiction.  (Doc. No. 1.)  The parties subsequently filed a Motion for a Stay pending non-binding mediation, which the Court granted on September 9, 2020.  (Doc. No. 6.)

After mediation proceedings were unsuccessful, the stay was lifted and Thogus was granted leave to file its First Amended Complaint, which also sets forth claims for breach of contract and enforcement of Molder's and Moldbuiler's Lien Rights under Ohio law.  (Doc. Nos. 8-2.)  On

---

[2] Mr. Kopf explained that it is not feasible for Bleep to obtain a new assembly machine, as it would take months to manufacture and would be extremely expensive.  *See* Kopf Hearing Testimony.

December 29, 2020, Bleep filed an Answer and Verified Counterclaims.  (Doc. No. 12.)  Among other things, Bleep asserts a counterclaim for breach of contract based on Thogus's alleged failure to immediately release Bleep's Bailed Property.  (*Id.* at ¶¶ 150-166.)

On December 30, 2020, Bleep filed a Motion for Preliminary and Permanent Injunction, in which it seeks an Order requiring Thogus to return Bleep's Bailed Property.  (Doc. No. 15.)  Thogus filed a Brief in Opposition on January 12, 2021, to which Bleep replied.  (Doc. Nos. 18, 19.)

On January 19, 2021, Thogus filed a Motion for Expedited Discovery.  (Doc. No. 20.)  Bleep opposed the Motion on numerous grounds.  (Doc. No. 24.)  On January 28, 2021, this Court denied Thogus's Motion on the grounds that its discovery requests were overly broad and not narrowly tailored to either of the specific issues raised in Bleep's Motion for Preliminary Injunction, i.e., (1) Bleep's "good faith" basis for disputing Thogus's demand for payment; and/or (2) Bleep's alleged irreparable harm.  (Doc. No. 30.)  On that same date, the Court set a Preliminary Injunction hearing for March 12, 2021.  (Doc. Nos 28, 29.)  The Court also set a discovery deadline of December 31, 2021.[3]  (*Id.*)

On March 12, 2021, this Court conducted an evidentiary hearing regarding Bleep's Motion for Preliminary Injunction.  (Doc. No. 39.) The Court heard argument from the counsel, as well as testimony from Bleep's President Henry Kopf and Thogus's President Larry Sansom.  (*Id.*)  This matter is now ripe and ready for resolution.

## II.    Legal Standard

---

[3] On February 18, 2021, Thogus served Subpoenas on fifteen (15) of Bleep's customers.  (Doc. Nos. 32-3 through 32-17.)  On February 22, 2021, Bleep filed a Motion to Quash the Subpoenas or, in the alternative, for a Protective Order. (Doc. No. 32.)  Thogus filed a Brief in Opposition on February 26, 2021, to which Bleep replied on March 2, 2021.  (Doc. Nos. 36, 37.)  On March 4, 2021, this Court issued an Order granting Bleep's Motion for a Protective Order. (Doc. No. 38.)

When considering a motion for preliminary injunction, the Court must consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without an injunction; (3) whether issuance of an injunction would cause substantial harm to others; and (4) whether the public interest would be served by the injunction. *See National Credit Union Administration Board v. Jurcevic*, 867 F.3d 616, 622 (6th Cir. 2017); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). *See also Palmer v. Harris*, 2018 WL 6062305 at *6 (N.D. Ohio Nov. 20, 2018). These factors should be balanced against each other but are "not prerequisites that must be met." *In re Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). *See also Avery Dennison Corp. v. Juhasz*, 924 F.Supp.2d 893, 899 (N.D. Ohio 2013).

A party seeking injunctive relief bears a heavy burden of establishing that the extraordinary and drastic remedy sought is appropriate under the circumstances. *See Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

## III. Analysis

The Court will consider each of the four preliminary injunction factors separately, below.

### A. Likelihood of Success on the Merits

First, the Court considers whether Bleep "has demonstrated 'a strong likelihood of success on the merits.'" *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 543 (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). "In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success."

12

*Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 402 (6th Cir. 1997). Nonetheless, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

In its Motion, Bleep argues that it is likely to succeed on the merits of its claim that Thogus breached the Bailment Provision of the MSA.  (Doc. No.  15.)  Bleep argues that it has satisfied the elements of a bailment claim under Ohio law because (1) Section 14.1 of the MSA constitutes a contract of bailment between Thogus and Bleep; (2) Thogus is currently in possession of the Bailed Property; and (3) Bleep has demanded that Thogus release the Bailed Property but Thogus has refused to do so.  (*Id.* at p. 10.)  In this regard, Bleep notes that it is undisputed that it has fully paid for all amounts due and owing to Thogus for the Bailed Property, most notably the molds.  (*Id.* at pp. 10-11.)

Bleep further asserts that it has satisfied the requirements of Section 14.1(b) of the MSA because it has demonstrated a "good faith" basis for disputing its alleged payment obligations to Thogus.  (*Id.*)  Specifically, Bleep argues that the amounts sought by Thogus in the First Amended Complaint are for (1) non-FDA compliant goods that were not received by Bleep; and (2) raw materials and "works in progress" in the possession of Thogus.  (*Id.*)  Bleep asserts that it has a good faith basis for believing it is not required to pay for either of these categories of materials under the MSA.  (*Id.*)  Finally, Bleep asserts that Thogus does not have a valid lien on the Bailed Property because Bleep has fully reimbursed Thogus for the Bailed Property and, further, because Thogus expressly waived any encumbrances on said Property in the MSA.  (*Id.* at p. 11.)

13

In response, Thogus argues that "Bleep's request for injunctive relief hinges upon a judicial determination as to whether Bleep tendered good faith payment of all amounts that are undisputed." (Doc. No. 18 at p. 9.)  Thogus argues that Bleep cannot demonstrate a likelihood of success on this issue in light of Bleep's partial payment of $428,276.22 under Purchase Order 0028.  (*Id.*) Specifically, Thogus maintains that Bleep's action in partially paying this Purchase Order "confirms that it viewed these goods as undisputed."  (*Id.*)

In its Reply Brief, Bleep argues that its partial payment under Purchase Order 00028 does not negate its argument that it has a good faith basis to dispute its alleged remaining payment obligations. (Doc. No. 19.)  Bleep asserts that it "paid **some** of Purchase Order 28 because Thogus only delivered **some** of the finished goods ordered—albeit late and while refusing to address Bleep's FDA regulatory and quality concerns." (*Id.* at p. 4) (emphasis in original).  Bleep argues that, under the terms of the MSA, it "has no obligation to pay Thogus in advance for unfinished goods or undelivered goods . . . and before having an opportunity to exercise its contractual right to inspect and reject the finished goods it ordered."  (*Id.*)

"Under Ohio law, 'a bailment is the delivery of goods or personal property by one person to another in trust for a particular purpose.'" *Barrett-O'Neill v. Lalo, LLC.*, 171 F.Supp.3d 725, 749 (S.D. Ohio 2016) (quoting *Verathon, Inc. v. DEX One Service, Inc.*, 2013 WL 1627073 at *8 (S.D. Ohio 2013)).  A contract of bailment "is formed like any other contract" and "may be express or implied." *George v. Whitmer*, 2006 WL 242563 at *2 (Ohio App. Jan 20, 2006) (citing *Bess v. Trader's World, Inc.*, 2001 WL 1652810 (Ohio App. Dec. 24, 2001); *Agricultural Ins. Co. v. Constantine* 144 Ohio St. 275, 58 N.E.2d 658, 663 (Ohio 1944); and *Giles v. Meyers*, 107 N.E.2d 777, 779 (Ohio 1952)).  *See also Verathon*, 2013 WL 1627073 at * 8.

14

In order to establish a *prima facie* case under a theory of bailment, "the bailor must prove: '(1) the contract of bailment, (2) delivery of the bailed property to the bailee[ ], and (3) failure of the bailee[ ] to deliver the bailed property undamaged at the termination of the bailment." *Vandeventer v. Vandeventer*, 132 Ohio App.3d 762, 768, 726 N.E.2d 534 (Ohio App. 12th Dist. 1999) (quoting *David v. Lose*, 7 Ohio St.2d 97, 99, 218 N.E.2d 442 (1966) paragraph one of the syllabus).  *See also JL McCoy v. Wandling*, 1993 WL 26734 at * 2 (6th Cir. Feb. 4, 1993)(applying Ohio law); *Barrett-O'Neill*, 171 F.Supp.3d at 749; *Garofoli v. Whiskey Island Partners*, 25 N.E.3d 400, 405-406 (Ohio App. 8th Dist. 2014);  *Albrecht v. Marinas International Consolidated, LP*, 2010 WL 4866289 at * 5 (Ohio App. 9th Dist. Nov. 24, 2010); *Morse v. Summit Moving Storage*, 2003 WL 1524581 at * 2 (Ohio App. 9th Dist. March 26, 2003).  Upon making a *prima facie* case, the burden of going forward with evidence shifts to the bailee to explain his failure to redeliver.  *See Agricultural Ins. Co. v. Constantine*, 144 Ohio St. 275, 58 N.E.2d 648 (1944).  *See also Albrecht*, 2010 WL 4866289 at * 5; *Jones v. Chase*, 1992 WL 112623 at * 2 (Ohio App. 10th Dist. May 19, 1992); *Interstate Steel Erectors, Inc. v. Nationwide Machinery Moving, Inc*., 1987 WL 9140 at * 2 (Ohio App. 8th Dist. April 2, 1987).

Here, it is undisputed that Section 14.1 of the MSA creates a contract of bailment between Thogus and Bleep.  The parties also agree that (1) the Bailed Property consists of the seventeen (17) molds and the assembly machine identified in Bleep's December 16, 2020 Demand Letter (Doc. No. 12-5); and (2) Bleep delivered the Bailed Property to Thogus.  It is further agreed that Bleep has reimbursed Thogus in full for the Bailed Property that Thogus was required to purchase in order to manufacture the DreamWay and DreamPort products, i.e., the molds.  Finally, it is undisputed that Bleep demanded release of the Bailed Property and that Thogus refused.

15

The parties do dispute, however, whether Thogus's refusal to release the Bailed Property occurred at the "termination of the bailment," i.e., the third element of a bailment claim.  As noted above, under the express terms of Section 14.1(b) of the Bailment Provision, the Bailed Property must be immediately released "so long as [Thogus] has been paid in full for all outstanding, undisputed in good faith, payment obligations of [Bleep] under this Agreement."  (Doc. No. 8-2 at PageID# 195.)  The parties strongly disagree as to whether Bleep has a "good faith" basis for disputing its alleged payment obligations under the MSA with respect to Purchase Order 00028.

Upon careful consideration, the Court concludes that Bleep has demonstrated that it is likely to succeed on the merits of its argument that it has a "good faith" basis for disputing its alleged payment obligations to Thogus.  During the hearing, Mr. Kopf testified that, throughout 2019 and 2020, Bleep repeatedly raised concerns with Thogus about its alleged failure to ensure that its quality control systems were FDA compliant.  In its Verified Counterclaim, Bleep states that its concerns only increased when, in October 2019, Thogus affirmatively stated that it would not validate its software or obtain ISO 13485 certification, both of which Bleep believes are necessary steps to achieve compliance with FDA standards. (Doc. No. 12 at ¶ 84.)  Not long after, in early 2020, Bleep began receiving customer complaints about products packaged with components missing and "clearly defective components," including "visibly cracked short hose tubing." (*Id*. at ¶ 97.)  Indeed, during the evidentiary hearing, Mr. Sansom himself acknowledged that Thogus received two formal complaints from Bleep in February 2020 regarding missing components.  *See* Sansom Hearing testimony.

When Bleep requested to conduct a full quality audit of Thogus's operations, Thogus refused and only permitted Bleep to conduct a limited "remote desk audit." (*Id*. at ¶ 92.)  Bleep introduced

16

evidence that it thereafter conducted a "desk audit" of Thogus's manufacturing system and that this audit "identified several deficiencies and areas of non-compliance, including specific findings, based on information provided by Thogus, that Thogus's manufacturing quality system software had never been validated for its intended use, as required." (*Id*. at ¶ 93.) *See also* Kopf Hearing testimony. For this reason, Bleep advised Thogus in May 2020 that "funds shall be placed in attorney's escrow account and released upon confirmation by Bleep's outside consultant that Thogus has systems and processes in place consistent with FDA medical device regulations and requirements." (Defendant's Hearing Exh. F.) By June 2020, Bleep advised Thogus that "no one on our side feels like Thogus has delivered on completion of the items needed yet for validation." (Defendant's Hearing Exh. H.) In response, Thogus assured Bleep that it would "work[] with better specificity with respect to the milestones and deliverables." (*Id*.)

Moreover, Bleep has produced evidence that a manual, visual inspection of its inventory of products from Thogus revealed "additional instances of Bleep's devices being manufactured and packaged by Thogus with visibly cracked and broken tubes, missing components, bags with no product at all in them, and multiple other quality issues." (Doc. No. 12 at ¶ 100.) *See also* Kopf Hearing Testimony. For example, Bleep introduced evidence that it discovered that "multiple packaged products were missing component parts, such as the quick release (QR) socket that connects certain tubing, a missing component issue that Bleep had notified Thogus about in January 2020, and Bleep found that cases of products shipped by Thogus contained insufficient or incorrect components." (*Id*. at ¶ 101.) *See also* Doc. No. 12-4. Bleep alleges that it reported these product defects to Thogus but received no response. (*Id*. at ¶ 102.)

17

Based on the above, the Court finds that Bleep has demonstrated a likelihood of success in showing that it has a "good faith" basis for disputing its alleged remaining payment obligations to Thogus. Specifically, the Court finds that the evidence presented regarding Bleep's concerns that Thogus's manufacturing process was not FDA compliant, combined with evidence of product deficiencies such as missing components, is sufficient to demonstrate that Bleep has a "good faith" basis for refusing to pay Thogus the amounts demanded in the First Amended Complaint. In so finding, the Court rejects Thogus's argument that Bleep waived this argument by making partial payments towards Purchase Order 0028. As Mr. Kopf testified, Bleep made interim payments to Thogus towards this Purchase Order -- despite Bleep's concerns regarding Thogus's alleged failure to achieve regulatory compliance -- in an effort to try to work with Thogus to resolve any issues so that production of the DreamWay and DreamPort products could successfully continue. *See* Kopf Hearing Testimony. When product deficiencies were found during manual inspection (including deficiencies unrelated to the Smooth Bor hose, such as missing components, etc.), Bleep elected to cease making payments. Under these circumstances, the Court is not persuaded by Thogus's argument that Bleep's partial payments are "fatal" to its "good faith" argument.

Accordingly, the Court finds that Bleep has demonstrated that it is likely to succeed on the merits of its breach of contract counterclaim based on the Bailment Provision of the MSA. The Court emphasizes, however, that it has not reached a determination as to whether Bleep has rightly refused payment with regard to the amounts sought by Thogus in the First Amended Complaint. That issue is reserved for a later date, after the parties have had a full opportunity to conduct discovery and present briefing with respect to Thogus's breach of contract claim. Rather, the Court simply finds that, based on the evidence before it, Bleep has demonstrated that it is likely to succeed on its

18

argument that it has a good faith basis for disputing its alleged payment obligations to Thogus, for purposes of Section 14.1(b) of the MSA.

Therefore, and for all the reasons set forth above, the Court finds that this factor weighs in favor of granting preliminary injunctive relief.[4]

## B. Irreparable Harm

"[T]he second factor that a court must consider when deciding whether to issue a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction." *Certified Restoration*, 511 F.3d at 550. A plaintiff's injury is considered "irreparable if it is not fully compensable by monetary damages." *Overstreet,* 305 F.3d at 578. "[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

The Court finds that Bleep has demonstrated that it will suffer irreparable harm if the Bailed Property is not released.  During the evidentiary hearing, Mr. Kopf testified that Bleep will go out of business if the Bailed Property is not released.  *See* Kopf Hearing Testimony.  He explained that, without access to the Bailed Property, Bleep is unable to manufacture either the DreamWay or DreamPort products.  *Id.*  Nor is it feasible for Bleep to purchase replacements for the Bailed Property as it would take months to manufacture replacement molds and a replacement machine and would cost well over $1 million.  *Id.*  Therefore, once Bleep depletes its existing stock, it will be unable to manufacture any more DreamWay and/or DreamPort products.  *Id.*  Bleep's customers will then be

---

[4]  Bleep also argues that Thogus has no valid lien on the Bailed Property under Ohio Rev Code §§ 1333.29 and 1333.34 because (1) Bleep has reimbursed Thogus in full for the molds; and (2) Thogus expressly agreed in the MSA that it would not place any encumbrances on the Bailed Property, including any lien.  (Doc. No. 15 at p. 11.)  Thogus does not respond to this argument.  In light of the lack of opposition, the Court agrees with Bleep.

forced to switch to a different sleep apnea product, a process which Mr. Kopf described as expensive and difficult.  *Id.*  Mr. Kopf testified that, if this occurs, Bleep's customer goodwill and reputation in the industry will be "completely destroyed."  *Id.*

In light of the above, the Court finds that Bleep will suffer irreparable harm if the Bailed Property is not released and, further, that this factor weighs heavily in favor of granting preliminary injunctive relief.  *See Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) (holding that "[i]t is appropriate to use a preliminary injunction to avoid harms to goodwill and competitive position" where there is a "realistic prospect of lost sales and market share.");  *Bowling Green Metalforming, LLC v. Solartec, Inc.*, 2008 WL 11378803 at * 2 (N.D. Ohio April 8, 2008) (finding irreparable injury where movant introduced evidence that, if its equipment was not returned, it would be forced to shut down two assembly lines).

### C.    Substantial Harm to Others

Next, the Court must consider "whether a preliminary injunction would cause substantial harm to others."  *Flight Options, LLC v. Int'l Brotherhood of Teamsters, Local 1108*, 863 F.3d 529, 540 (6th Cir. 2017).  For the following reasons, the Court finds that this factor also weighs in favor of granting preliminary injunctive relief.  Mr. Kopf testified that Bleep has four full-time employees and between 8 to 12 part-time employees.  *See* Kopf Hearing Testimony.  He also testified that Bleep has investors.  *Id.*  The Court finds that, if the Bailed Property is not released and Bleep goes out of business as a result, both its employees and its investors will suffer substantial harm.

Moreover, Mr. Kopf testified that, if Bleep runs out of existing stock and is no longer able to manufacture more DreamWay and/or DreamPort products, its customers will be forced to switch to another sleep apnea product.  Mr. Kopf described this process as both difficult and expensive.  *See*

20

Kopf Hearing Testimony.  Thogus did not present any evidence contradicting Mr. Kopf's testimony. Thus, if the Bailed Property is not returned, Bleep's customers may also be substantially harmed.

Finally, Thogus has not demonstrated that it will be substantially harmed if it is forced to release the Bailed Property.  During the hearing, Mr. Sansom testified that Thogus has "no use" for the Bailed Property in its current state.  *See* Sansom Hearing Testimony.  He further acknowledged that, pursuant to the terms of the MSA, Thogus is not permitted to use the Bailed Property for any purpose other than for the manufacture of Bleep's products.  *Id.*  Likewise, Thogus is not permitted to modify either the molds or machines without Bleep's express permission.  *Id.*  Further, Thogus has not introduced any evidence that the release of the Bailed Property will inhibit Thogus's ability to collect the amount that it claims it is owed.  Therefore, Thogus has not demonstrated that it will be substantially harmed if the Court orders the release of the Bailed Property.

Accordingly, and for all the reasons set forth above, the Court finds that this factor weighs in favor of granting preliminary injunctive relief.

D.     **Public Interest**

The fourth and final factor courts must consider when granting a preliminary injunction is "whether the public interest will be served by an injunction." *Flight Options*, 863 F.3d at 540.  The Court finds that this factor weighs in favor of granting a preliminary injunction.  As Bleep correctly notes, courts have held that the public's interest in upholding contractual provisions supports granting a preliminary injunction.  *See, e.g, Skurka Aerospace, Inc. v. Eaton Aerospace, LLC*, 781 F.Supp.2d 561, 579 (N.D. Ohio 2011).  Moreover, absent the return of the Bailed Property, there is a possibility that Bleep's employees will become unemployed.  *See Bowling Green Metalforming, LLC,* 2008 WL 11378803 at * 3 (finding this factor met where movant introduced evidence that its employees would

become lose their jobs if the property at issue was not returned). Accordingly, the Court finds that this factor also weighs in favor of granting preliminary injunctive relief.

### E. Bond

Fed. R. Civ. P. 65(c) provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Although the language of Rule 65(c) appears to be mandatory, the rule in the Sixth Circuit "has long been that the district court possesses discretion over whether to require the posting of security." *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). Thus, "[w]hile a district court must consider whether security is appropriate, the court need not actually require security—instead, the decision is left to the sound discretion of the court." *Midwest Guar. Bank v. Guar. Bank*, 270 F. Supp. 2d 900, 925 (E.D. Mich. 2003).

Here, neither party has addressed the issue of bond, either in their briefing before this Court or during the March 12, 2021 hearing. Because Thogus has not argued that a bond should be required, demonstrated any harm it would suffer as a result of an injunction, or suggested what amount may be appropriate for Bleep to post as security, the Court concludes it is appropriate not to require security in this case and will not require Bleep to post a bond.[5]

### IV. Conclusion

---

[5] In this regard, the Court further notes that Section 14.1(b) of the MSA provides that: "Seller's continued holding of Bailed Property after demand has been made by Buyer for delivery will substantially impair the value thereof, and, accordingly, **Buyer will be entitled to a court order of possession without any need for proving damages or a bond**." (Doc. No. 8-2 at PageID# 195-196.)

22

In sum, the Court finds that all four factors weigh in favor of granting preliminary injunctive relief.  Therefore, and for all the foregoing reasons, Bleep's Motion for Preliminary and Permanent Injunctive Relief (Doc. No. 15) is GRANTED to the extent it seeks preliminary injunctive relief.  Bleep's Motion is DENIED to the extent it seeks permanent injunctive relief.  Thogus is hereby ordered to immediately release the Bailed Property and take whatever steps are necessary to assist Bleep with the removal of the Bailed Property from Thogus's premises.  The removal of the Bailed Property shall be at Bleep's expense.

**IT IS SO ORDERED.**


_s/Pamela A. Barker_____
PAMELA A. BARKER
Date:  March 18, 2021                              U. S. DISTRICT JUDGE

23